George GOFF, et al., Plaintiffs,

v.

Charles HARPER, et al., Defendants.

No. 4:90–CV–50365.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 4, 1999.

George Goff, Fort Madison, IA, pro se.

Philip B. Mears, Patrick E. Ingram, Mears Law Office, Iowa City, IA, for George Goff, Allen Langley, Tim Thompson.

Michael A. Bartnick, Fort Madison, IA, pro se.

Gordon E. Allen, Bonnie Jean Campbell, Kristin W. Ensign, Atty. Gen. of Iowa, Des Moines, IA, for Charles Harper, Ronald Welder, John Henry, Gerardo Acevedo.

Kristin W. Ensign, Atty. Gen. of Iowa, Des Moines, IA, for Gerardo Acevedo, Paul Hedgepeth, John Emmett.

Theodore Brown, Leavenworth, KS, movant, pro se.

Vincent Antone Johnson, Fort Madison, IA, movant, pro se.

**912**

## ORDER

O'BRIEN, Senior District Judge.

### TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Summary of Ruling | 912 |
| II. | Introduction and Procedural Background | 913 |
| III. | Legal Analysis | 913 |
| | A. Extraordinarily Long Lockup Sentences | 914 |
| | 1. Defendants' Plan | 914 |
| | 2. Plaintiffs' Objections | 915 |
| | 3. Appropriate Relief | 917 |
| | B. Inadequate Mental Health Treatment | 921 |
| | 1. Defendants' Plan | 922 |
| | 2. Plaintiffs' Objections | 922 |
| | 3. Appropriate Relief | 923 |
| | C. Exercise | 924 |
| | 1. Defendants' Plan | 924 |
| | 2. Plaintiffs' Objections | 924 |
| | 3. Appropriate Relief | 924 |
| | D. Pandemonium and Bedlam | 926 |
| | 1. Defendants' Plan | 926 |
| | 2. Plaintiffs' Objections | 926 |
| | 3. Appropriate Relief | 926 |
| IV. | Conclusion | 927 |

This matter comes before the Court in relation to defendants' plan, filed July 1, 1999, to remedy the four constitutional violations found by this Court in its order of June 5, 1997, and plaintiffs' objections thereto. After careful consideration of the parties' positions, the Court is persuaded that the relief detailed in this order will be granted.

### I. Summary of Ruling

In this Order, the Court has, in summary:

(1) Considered the plan submitted by the defendants on July 1, 1999, to remedy the constitutional violations found by this Court to exist at Fort Madison penitentiary because of improper treatment and handling of inmates.

(2) As to the constitutional violation of substantive due process resulting from extraordinarily long lockup sentences, the Court is persuaded that the defendants have taken steps to significantly lessen the overall length of disciplinary detention (hole time) to be served by inmates. However, the new policy has increased the length of disciplinary detention that may be imposed for one incident. The Court has approved most of the new plan, but has set some restrictions and monitoring on the implementation of the new administrative segregation and disciplinary policies.

(3) As to the constitutional violation involving Inadequate Mental Health Treatment, the Court is persuaded that the defendants have taken steps to significantly lessen the Eighth Amendment violation which arose from the defendants' deliberate indifference to the mentally ill and mentally disordered inmates held for medical and psychiatric care by providing for a new 200–bed special needs unit at Fort Madison. It is recognized that there will be an "interim" problem until that unit is fully operating, but some steps are being taken to lessen that problem.

(4) As to the constitutional violation involving the deprivation of exercise for inmates in lockup during the winter months, the Court is persuaded that the defendants have taken significant steps to alleviate this Eighth Amendment violation by promising that the new 200–bed unit shall have indoor exercise facilities, and by already commencing to provide inside exercise areas in each lockup cellhouse now in use at Fort Madison.

(5) As to the constitutional violation found by the Court resulting from the pandemonium and bedlam the mentally stable inmates must suffer because they are intermingled with mentally ill inmates who either cannot or do not control them behavior so as to create a "bug range," the Court is persuaded that the defendants have taken significant steps to lessen the bedlam in the short run by, for the most part, not concentrating disruptive inmates in

one area where their cumulative offensive conduct produced very stressful living quarters. Another short-term positive step is to use the medical facility at Oakdale in an effort to rehabilitate "bug range" type inmates and, further, to use the new facility at Newton for the same purpose. The new 200–bed special needs unit at Fort Madison will go a long ways to alleviate the long-term bedlam as it is presumed that the mentally ill and mentally disordered inmates will be housed therein and the mentally stable will not be there.

## II. Introduction and Procedural Background

In July 1990, Iowa State Penitentiary (ISP) inmate George Goff brought this lawsuit under 42 U.S.C. § 1983, alleging that various conditions of confinement at ISP violated his constitutional rights. On September 13, 1995, the Court granted plaintiff's unresisted motion to certify the action as a class action. On June 5, 1997, following trial of this case, the Court entered an extensive order setting forth its findings of fact and conclusions of law. In that order, the Court found four constitutional violations: 1) the violation of substantive due process resulting from the extraordinarily long lockup sentences; 2) the violation of the Eighth Amendment resulting from the inadequate mental health treatment received by mentally ill and mentally disordered inmates; 3) the violation of the Eighth Amendment resulting from the deprivation of exercise for inmates in lockup during the winter months; and 4) the violation of the Eighth Amendment resulting from the pandemonium and bedlam the mentally-stable inmates must suffer because they are intermingled with the mentally-ill inmates who either cannot or do not control their behavior. In its order of June 5, 1997, the

Court directed the ISP officials to develop a plan to remedy these constitutional violations, thus entering the remedial portion of this case.

On September 10, 1997, October 8, 1998, and December 11, 1998, defendants responded with what the Court denoted as "plan one," "plan two," and "plan three," respectively.[1] Following a hearing held June 15, 1999, the Court ordered defendants to submit a fourth plan. On July 1, 1999, over two years after they had been initially ordered to develop a plan to remedy the problems found by this Court, defendants filed the plan now before the Court (hereafter referred to as "plan four"), and plaintiffs thereafter filed their objections to it. Plan four, while not perfect, was much closer to what the Court had ordered to be completed by July 20, 1997. The two year delay in getting a plan that could be appropriately considered (plan four) was almost entirely the fault of the defendants, however, to their credit plan four is now a better plan due to the two Iowa legislative sessions which provided the money to make the improvements possible.

## III. Legal Analysis

As is evident from the history set out above, this case has been in the remedial stage for two years now because the Court has been relying on defendants to develop an adequate plan to remedy the violations found by the Court. The Court recognizes that the task of crafting appropriate relief for these plaintiffs is not an easy one.

During the pendency of this action, the Prison Litigation Reform Act of 1995 (PLRA) was enacted. Of particular importance to this remedial stage of the present case is that portion of the act codified at 18 U.S.C. § 3626. Section 3626 provides, in part:

> Prospective relief in any civil action with respect to prison conditions shall extend

---

1. The Court discussed these various plans and their inadequacies in its order filed June 21, 1999.

no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).

In addition to the requirements imposed by § 3626, the Court is mindful that in *Lewis v. Casey*, 518 U.S. 343, 362, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the United States Supreme Court reiterated that " '[t]he strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors ... also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons.' " The *Casey* Court went on to approve of the procedure which had been utilized in *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), to correct violations which had been determined by that district court:

> [R]ecognizing that "determining the 'appropriate relief to be ordered ... presents a difficult problem,' " the court " 'charge[d] the Department of Correction with the task of devising a Constitutionally sound program' to assure inmate access to the courts." The state responded with a proposal, which the District Court ultimately approved with minor changes, after considering objections raised by the inmates. We praised this procedure, observing that the court had "scrupulously respected the limits on [its] role," by "not ... thrust[ing] itself into prison administration" and instead permitting "[p]rison administrators [to] exercis[e] wide discretion within

the bounds of constitutional requirements."

*Id.* at 362–363, 116 S.Ct. 2174 (citations omitted).

This Court recognized that defendants should be given the first opportunity to correct the violations at ISP and has given defendants not only the first opportunity but numerous opportunities, over the course of two years, to "devise a Constitutionally sound program" to remedy these violations. The Court commends defendants for many of the steps which they have already taken or to which they have committed; however, for the reasons set out below, even defendants' "plan four" cannot be adopted wholesale as a remedy to the constitutional violations which exist at ISP. The time has come for this Court to rule on defendants' plan and craft additional, narrowly drawn relief where necessary to fully correct the constitutional violations found in this case.

The Court will now proceed with a summary of defendants' plan to remedy each of the four constitutional violations found, followed by plaintiffs' objections thereto, and the Court's determination of the appropriate relief to be granted to plaintiffs.

### A. Extraordinarily Long Lockup Sentences

 In its findings of fact and conclusions of law, the Court determined that "the conditions and procedures related to lockup sentences at the Iowa State Penitentiary combine to create an atmosphere where some inmates are incapable of extricating themselves from lockup and violates the inmates' substantive due process rights." Order at 82 (June 5, 1997).

#### 1. Defendants' Plan

Defendants have adopted a new disciplinary policy which includes a matrix setting specific ranges of sanctions to be dispensed for violations of the disciplinary rules. *See* Exhibit 111 (also referred to as the "Purple Rule Book.") Under the new disciplinary policy, disciplinary detention is

limited to a maximum of 720 days which defendants argue is far less than the amounts of total lockup time (disciplinary detention and administrative segregation) imposed under the prior policy. An additional, very commendable measure taken by defendants was to grant amnesty whereby each locked offender had his disciplinary time as of July 1, 1998, vacated.[2] Defendants have restructured the administrative segregation policy so as to include a requirement that locked offenders are advised of specific behavioral requirements which will enable them to return to general population. *See* Exhibit 112. Under the administrative segregation system, inmates go through classification reviews at least once every six months and are advanced out of administrative segregation and to another, less restrictive status only with the approval of the classification committee.[3] Defendants have added to the Iowa Department of Corrections (IDOC) an administrative officer whose duty it is to train administrative law judges (ALJs) and ensure compliance with the Purple Rule Book.

Defendants argue that more general population cells, which will presumably permit easier movement out of administrative segregation, have been created by the movement of approximately 100 protective custody inmates from ISP to the Clarinda Correctional Facility and the conversion of Cellhouse 419 to general population. A further measure planned by defendants to remedy the substantive due process viola-

tion is to use a new reintegration unit at Newton Correctional Facility to permit locked offenders from ISP to be advanced from administrative segregation back to general population status at ISP or other institutions. Through the reintegration program, ISP lockup inmates who show willingness to change would be provided an opportunity to return to general population. Defendants expect, and have so testified, that the Newton reintegration program will be operational for 150 inmates, many of whom will be pulled from lockup at ISP, by August 1999.

## 2. Plaintiffs' Objections

Plaintiffs object to the fact that the amount of disciplinary detention time to be served for a single incident has increased greatly since the Purple Rule Book, Exhibit 111, went into effect. Under the old policy, inmates could not receive more than 30 days of disciplinary detention for a single incident while under the new policy, they might receive up to 365 days disciplinary detention for a. single incident.[4] *See* Exhibit 21 (also referred to as the "Green Rule Book.") Further, plaintiffs object to the fact that ISP has abandoned the practice of giving locked inmates periodic "breaks" from disciplinary detention during which they were permitted to make personal phone calls and have access to greater amounts of property. Plaintiffs contend that inmates should be required to serve no more than 30 consecutive days in disciplinary detention at any one time.[5]

2. In some cases, inmates had accumulated lockup time of up to 50 years. Under the amnesty policy, even such lengthy sentences were vacated.

3. The administrative segregation/disciplinary detention policy states that the classification committee is composed of "at a minimum, a counselor, the security director or designee, and the treatment director or designee." *See* Exhibit 112 at 2.

4. Plaintiffs concede, as they must, that under the old policy, they might have also received a determinate, nonpunitive restriction in the maximum security cellhouse, but point out

that such administrative segregation time was much less restrictive than disciplinary detention is now.

5. In support of this proposition, plaintiffs rely on *Finney v. Hutto*, 548 F.2d 740, 742 (8th Cir.1977) (affirming, on the basis of the district court's well reasoned ruling, the conclusion that "confinement in punitive isolation for more than thirty days is cruel and unusual punishment and thus impermissible."). As further support for this position, plaintiffs rely on the October 15, 1998, testimony of their expert witness, Gordon Kamka, that disciplinary detention in excess of 30 days leads to frustration and anger, then to lethargy and hopelessness "[a]nd that's the reason that we

Plaintiffs' final objection as to disciplinary detention is their contention that the conditions under which disciplinary detention is served have become more spartan.[6]

As to the administrative segregation policy, plaintiffs argue that the new indeterminate confinement in administrative segregation, in contrast with the old determinate confinement, creates a condition where ISP staff may abuse the process by misuse of the log book entry system and detain inmates in administrative segregation unnecessarily.[7] Plaintiffs also object to the fact that once an inmate has worked his way out of administrative segregation, he will likely be placed in mandatory idle, a status which plaintiffs argue is really still a lockup status since inmates there remain locked for a large portion of the day.[8]

In addition to plaintiffs' objections as to the substance of the current disciplinary detention and administrative segregation policies, plaintiffs object that defendants are implementing these new policies in a manner which does not serve to remedy the problems found by the Court. Specifically, plaintiffs object to the fact that even when inmates have complied with the expectations communicated to them as part of the administrative segregation classification reviews as things they must do in order to advance, they must wait, sometimes for months, for cells to open before they can move to a general population cellhouse.

Additionally, plaintiffs object that these "waiting" inmates who are not in disciplinary detention status often find themselves housed among inmates who are in disciplinary detention and the non-disciplinary detention lockup inmates receive no more property or privileges than if they actually were in disciplinary detention, just because of the rules and/or limitations imposed on the disciplinary detention inmates with whom they are housed. The gist of plaintiffs' objection is that movement of inmates from more restrictive statuses, like disciplinary detention and administrative segregation, to less restrictive statuses, like mandatory idle and general population, is

try to—consistently try to see limits set on conditions of Disciplinary Segregation." (Tr. 114–115.)

6. Plaintiffs argue that in the new disciplinary detention status, an inmate may have virtually no property, visits are non-contact with immediate family only, and there is nothing to do to occupy the inmates' time.

7. The log book is a tool used by administrators in the lockup unit. At the hearing held in this case on July 27, 1998, IDOC Director Kautzky was asked about the use of log book entries. (Tr. 72–75, 80, 110–112.) Director Kautzky explained that if staff members see an inmate do something wrong, but not sufficiently serious to charge the inmate with, they may enter an inmate's name in the log book along with the date and a description of behavior engaged in by said inmate. This is conduct which the staff member believes should be considered in evaluating the inmate's fitness to move to a different status. The inmate receives no notice that his name has been placed in the log book, nor does he receive a hearing concerning the entry; however, the presence of a log book entry may be used to justify the further detention of an inmate in a particular administrative segrega-

tion status. Director Kautzky testified that he believed that the classification committee would not extend confinement in administrative segregation because of minor entries in the log book and that, if this turned out to be the case, the new administrator he had hired to oversee the classification process for the entire IDOC would uncover and, presumably, correct it quickly. (Tr. 112–113.)

8. Testimony in this case has been that inmates in mandatory idle are considered by IDOC to be in general population status except that they do not have jobs. Because they do not have jobs, many mandatory idle inmates remain locked in their cells for a large portion of the day. At the hearing held on June 15, 1999, ISP Security Director Colonel John Emmett testified that there are opportunities for inmates in mandatory idle to get out of their cells for such activities as group exercise, visits, church services, counseling, or school. (Tr. 95.) Interestingly, during a hearing held in this case on June 15, 1999, Director Kautzky testified that he was still trying to determine whether mandatory idle was a true general population status or a locked status and that as it is currently structured, it "looks and smells" like a locked status. (Tr. 35, 59.)

slowed considerably due to an inadequacy in the number of cells designated for general population. For example, if ISP does not have a general population cell to which to move an inmate who has complied with the expectations set for him in administrative segregation, he must remain in the more restrictive administrative segregation status with its limited property and privileges until a general population cell becomes available for him.

Plaintiffs object to the newly imposed use of log book entries to extend the time that an inmate stays in administrative segregation even though the inmate has never been given an opportunity to be heard in regard to the log book entry. Finally, plaintiffs object that while the administrative segregation policy indicates that inmates will be given specific expectations to meet so that they may advance out of administrative segregation, the behavior expectation sheets which are given to them by staff at periodic reviews are often not meaningful and, therefore, render the review process meaningless.

### 3. Appropriate Relief

By way of background, it is important to understand that, under the rules currently in place at ISP, an inmate who receives a major report may find himself sentenced to a *determinate* number of days to be spent in a punitive locked status called disciplinary detention. After he has served the requisite number of days in disciplinary detention, the inmate goes before a classification committee which determines what status he will be in and where he will next be housed. The inmate may find himself classified for general population, mandatory idle or administrative

segregation.[9] Inmates in general population enjoy more freedom and privileges than those in mandatory idle who, in turn, enjoy more freedom and privileges than those in administrative segregation. If the inmate finds himself assigned to administrative segregation, he will be placed in one of several administrative segregation statuses for an *indeterminate* period of time.[10] When, through the classification review process, the administration of ISP is convinced that the inmate should advance out of any particular level of administrative segregation to another level of administrative segregation or to mandatory idle or general population, the inmate will advance. With that background in mind, the Court will address defendants' plan and plaintiffs' objections.

The Court notes that defendants plan includes several positive steps, namely the adoption of a matrix, or range of punishments to be imposed, for disciplinary sanctions, the adoption of a uniform disciplinary policy, the adoption of a new administrative segregation policy, the commitment to the 200–bed special needs unit, the amnesty provided on July 1, 1998, and the development of the reintegration unit at Newton. Taken together, these steps go a long way toward remedying the substantive due process violation found by the Court in this case. Plaintiffs objections to defendants' plan include substantive objections to the new disciplinary policy as well as objections relating to the implementation of the new disciplinary and administrative segregation policies.

The Court will first address plaintiffs' substantive objections to the new disciplin-

---

**9.** Defendants contend that general population and mandatory idle are both "general population" statuses but that inmates assigned to mandatory idle do not have jobs. Because of the lack of jobs for mandatory idle inmates, they spend a significantly larger portion of the day locked in their cells than do inmates who are classified as general population.

**10.** The administrative segregation policy describes several distinct statuses. For example,

ple, "AS3" is the status for inmates placed in non-voluntary protective custody. "AS6" is a status used to designate inmates who are under investigation for possible rules violations. "AS8" has been designated as an appropriate status for "intractable" inmates. "Disruptive" inmates are placed in "AS9." *See* Exhibit 112 at 3–5. The bulk of lockup inmates who are not serving disciplinary detention are classified as either AS8 or AS9.

ary policy, particularly that the increase in the amount of disciplinary detention from a maximum of 30 days for a single incident to a maximum of 365 days for a single incident should be rejected and that the "breaks" in disciplinary detention historically provided for should be reinstated.[11] As to the increase to 365 days maximum for a very serious single incident such as murder, Director Kautzky testified on October 15, 1998, that such a penalty was necessary to dissuade inmates from certain violent behaviors. (Tr. 81–82.) The Court cannot find fault with Director Kautzky's reasoning that the availability of certain disciplinary sanctions is necessary for the safety and well-being of those employed in our penal institutions and that of other inmates. Further, IDOC Director Kautzky and ALJ Harper testified at the hearing held in this case on October 15, 1998, that while it is possible that an inmate might receive up to 720 days disciplinary detention for a series of incidents, their practice is that an inmate's release date from disciplinary detention will never be more than two years out. (Tr. 92, 193–195.) In other words, defendants have agreed that if an inmate is already doing 720 days disciplinary detention, they will not "stack" additional disciplinary detention time on top of that 720 days.[12] The Court expects that defendants will contin-ue this policy of limiting an inmate's total disciplinary detention to be served, as of any given day, to 720 days into the future. With this commitment from defendants, the Court is persuaded that its concern arising from the fact that many inmates were facing 20 years or more of disciplinary detention is significantly lessened.

The Court is, however, concerned as to the elimination of "breaks" from the new disciplinary detention policy. In the twenty-one years that this Court has sat on cases involving Iowa State Penitentiary, there has been marked improvement in the way prisoners have been handled. For example, Judge William Stuart, in a very helpful ruling, capped the number of prisoners that could be incarcerated in the "Fort." A new medical area was added. Television was allowed in the cells. Warden Nix, by his compartmentalizing, made the Fort a safer place. Other progressive things happened. There have been different designations over the years for punitive lockup at ISP. Early on it was called the "hole" and provided for maximum deprivations relating to a prisoner's conditions of confinement. It is now called disciplinary detention. Disciplinary detention includes no moving around except in chains, no television, no radio, no newspapers, magazines or other source of outside news, no cigarettes, no personal phone

11. The drastic change in length of disciplinary detention sentences can be seen by comparing the newer Purple Rule Book and the Green Rule Book which it replaced. The newer, Purple Rule Book provides:
 6. Disciplinary Detention:
 a) Continuous disciplinary detention shall not exceed 365 days for any incident or 730 days for a series of incidents.
 b) There will be 30 day reviews by the appropriate committee when confinement in disciplinary detention exceeds 30 days.
 c) Conditions of Confinement: Assignment to a single or double occupancy cell, non smoking environment, access to legal materials, shower and exercise period not to exceed one hour per day five days a week.
 See Exhibit 111 at 16.
 The Green Rule Book, entitled "Disciplinary Policy and Procedures for the Govern-ment of the Iowa State Penitentiary Inmates," states:
 (1) Disciplinary detention normally for no more than fifteen days per incident. Disciplinary detention in excess of fifteen days arising from one incident is limited to cases of serious and dangerous violence or attempted violence directed at other persons or other unusual threats to the security and order of the institution. In no case may over thirty days be assessed arising from one incident.
 See Exhibit 21 at 7.

12. Of course, if an inmate who had maxed out his disciplinary detention time at 720 days has completed, for example, nine months of disciplinary detention, and then he picked up new reports, he could receive up to nine months of additional disciplinary detention if those reports warranted such a sanction.

calls, no contact visits, no church, and limited exercise, and virtually no personal property. It is true that now, in recent years, punitive lockup is a cleaner, better lighted place, where they get more showers and more exercise is available. However, it is, as plaintiffs contend, a very spartan existence.

The question before us is, must an inmate who has been sentenced to any number of days over thirty in disciplinary detention serve that time continuously or can he come up for a "breath of air" and have some period out of such conditions after every thirty days? Historically, over the last 20 years, during which this Court has presided over litigation involving ISP, the policy had been that inmates received such "breaks."

During the pendency of this litigation, the IDOC administration has increased the length of disciplinary detention sentences dramatically, as discussed above, and at the same time, eliminated the ability of inmates to have "breaks" from this spartan status. While, as mentioned, "hole" time, by whatever name, is not quite as bad now as it was, it is still wrong not to have "breaks" since, as discussed above in footnote 5, *Finney v. Hutto* says, "Confinement in punitive isolation for more than thirty days is a cruel and unusual punishment and thus impermissible." As Gordon Kamka, the plaintiffs' expert witness testified on October 15, 1998 that disciplinary detention in excess of thirty days leads to frustration and anger, then to lethargy and hopelessness "[a]nd that's the reason that we try to—consistently try to see limits set on conditions of Disciplinary Segregation." (Tr. 114–15.)

This Court is not granting the plaintiffs' solid request for no periods of disciplinary detention longer than thirty days. The reason for this is that the Court is persuaded that 18 U.S.C. § 3626 would not allow and/or the appellate courts would not approve an order of this Court finding that the defendants cannot put anyone in disciplinary detention for more than thirty days

even where such a cap for a single incident has been the history of the "Fort" for many years. We are addressing the new rule, which by its silence says in effect that no matter how long the sentence is, there will be no "breaks" in it. *See* Exhibit 111.

In the late seventies and early eighties, the "Fort" was run by "real" hardliners compared, in this Court's perception, to those who now are in charge. These hardliners seemed to enjoy fomenting problems between types of inmates. Inmates were in the hole for years at a time, but as tough as the administration was, the inmate in the "hole" was *always* given a break; the term served was not continuous. Sometimes it was one day out for every ten days in or one day out for every fifteen and/or thirty days in.

This Court, despite claims to the contrary, is persuaded that the defendants here can devise a plan that will in no way compromise security but will give an inmate in disciplinary detention a two-day (48–hour) break every thirty days so that the new, long disciplinary detention sentences will be less likely to manufacture new candidates for the 200–bed special needs addition because they have gone "buggy" while serving long, uninterrupted periods in disciplinary detention.

The fourth plan submitted by the defendants provides that there shall be thirty-day reviews by the classification committee (Plan 4, page 8). In the event the committee decides not to let an inmate out after the thirty-day review, this Court is persuaded that an automatic two-day (48–hour) break shall be given that inmate.

The Court directs and orders that the new plan will be modified to allow a one-day "breath of air" after every thirty days served, even if that "breath of air" only allows a couple of personal telephone calls and a chance to, just for that period, have access to some additional personal property the inmate may own such as some cigarettes, a radio, a television, and a newspaper.

The Court is troubled by plaintiffs' argument that defendants are doing a poor job of implementing the new policies governing discipline and administrative segregation. For example, if inmates who have completed their disciplinary detention time are advanced to administrative segregation status, plaintiffs argue they must be permitted the same privileges and property afforded to other inmates in the same administrative segregation classification at ISP regardless of the cellblock in which they are housed. Plaintiffs contend that this is not happening now. They contend that inmates who have completed their term of disciplinary detention, which is the only punitive lockup status according to defendants, remain housed for lengthy periods thereafter among disciplinary detention inmates and are denied additional personal property because the disciplinary detention inmates are not allowed such items. To have their disciplinary detention time end, but keep them with the same very limited property and privileges as disciplinary detention inmates because they remain housed in disciplinary detention ranges or units does nothing more than change the "label" affixed to their confinement, and it does not make the post-disciplinary detention confinement any less punitive.

While the new policies set out above go toward remedying the substantive due process violation found by the Court, a poor implementation of them will not solve these problems and may, in fact, make things worse than they were before since the administrative segregation periods are now indefinite periods rather than definite periods. It is important to remember that, during the course of the proceedings in this case, it became clear to everyone involved that there were problems in implementing the new policies at ISP. In one instance, for example, the security director for ISP testified before this Court as to the fact that for a period of several months after the effective date of the new administrative segregation policy, ISP administration had confused two of the administrative segregation categories described therein and, as a result of that mixup, had improperly mis-classified hundreds of inmates.[13]

The plan proposed to the Court by defendants includes the new disciplinary and administrative segregation policies. If the Court adopts these policies and defendants do not follow them, plaintiffs are sure to request from this Court an order for defendants to show cause why they should not be found in contempt. As the parties well know, due to the protracted nature of this case, contempt proceedings may require the marshaling of substantial resources by both parties. The Court is not adverse to deciding such issues when they

13. At a hearing held in this case on October 15, 1998, it became apparent that there was confusion about the implementation of the new administrative segregation policy and the criteria for being placed in two distinct administrative segregation levels, namely AS8 and AS9. The following exchange occurred between counsel for defendants and ISP's security director, Colonel John Emmett:

Q I want to go over some things that have come out during the course of the last day that I think you can probably shed some light on, and probably we might start in reverse order.
Can you relate to the Court and clarify it for us the history of the A–9, A–8 confusion which I now, after hearing Mr. Eaves [ISP treatment director], recognize is still continuing.

A Well, I think as of today and as of tomorrow morning when I meet with staff there is no misunderstanding about what it is.
Q And why is that?
A Because I'm going to correct it tomorrow morning.
Q And was that based on a conversation you had at lunch [today] with Director Kautzky?
A Well, I had some feeling after the last time [the Court held a hearing in this case on July 27 and 28, 1998] that there was some problems expressed that—to some other administrators who felt there wasn't and decision was made not to change it.
After talking with the Director today and with the Acting Warden today, there's some changes that are going to be made.
(Tr. 255–256.)

arise, but would like to avoid having to do so, especially when other avenues to the same result, namely solving the substantive due process violation found by the Court, exist.

The Court is persuaded that such alternate avenues exist here. This Court has been impressed with the professionalism shown to date by Director Kautzky and is certain that he is doing all that he can to ensure that Iowa has a corrections department which accomplishes the purposes it must but at the same time is one which will not cause the people of Iowa to be ashamed when the straight facts as to conditions are brought to their attention. Further, the Court is certain that Director Kautzky spends an appropriate portion of his time communicating with the administration of ISP. In order to provide an informal means for resolving the issues relating to implementation of the new administrative segregation and disciplinary detention polices which are already looming large on the horizon, the Court is persuaded that it would also be appropriate for Director Kautzky, or his designee who is not a person employed at ISP, to meet, with three representatives from the plaintiff class, to be chosen by the plaintiffs, for an adequate time not to exceed three hours once a month for each of the next six months so that he may receive input from the inmates' as to problems they are experiencing with the implementation of this policy.[14] These meetings should be face to face but could be held via the Iowa Communications Network (ICN) if a personal meeting proves to be difficult.

To plaintiffs, the Court must impress that these sessions are not to be used as general complaint sessions; rather, they are intended as a vehicle for plaintiffs to bring forward specific and concrete examples of problems and mis-implementation

of the new policies in order to provide defendants the opportunity to resolve any problems they discover through these meetings without further intervention from this Court. The Court is persuaded that this informal means of resolving the implementation problems relating to the new policies will be much less intrusive on defendants' administration of ISP than would the intervention of this Court and/or possible contempt proceedings.

The Court recognizes that plaintiffs object to certain portions of the plan defendants have developed to correct the problem of extraordinarily long lockup sentences, but if defendants do all the progressive things they are talking about and promising as to these policies and act appropriately, then this portion of defendants' plan, along with the additional relief described by the Court, could serve to remedy the violation found by the Court. In accordance with 18 U.S.C. § 3626(a), the Court finds that the relief ordered to remedy the constitutional violation relating to extraordinarily long lockup sentences is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

## B. Inadequate Mental Health Treatment

In its findings of fact and conclusions of law, this Court concluded that defendants "have and are violating the Eighth Amendment rights of those inmates who are mentally ill or mentally disordered because they have acted with deliberate indifference to the serious medical need these inmates have for the treatment they would receive in a special needs unit." Order at 95 (June 5, 1997).[15] This

14. To anyone who might believe that such meetings are a great imposition on Director Kautzky, the Court would respond that Director Kautzky has shown an active interest in this case since he joined the Iowa Department of Corrections (IDOC) during the reme-

dial stage of this case and has spent appropriate periods of time to stay on top of all the issues involved in this lawsuit much to his credit.

15. As is apparent from the Court's findings of fact and conclusions of law entered in this

conclusion came after findings by the Court that inmates, who were or later became mentally ill or disordered, could be housed in lockup cellhouses and never be diagnosed and treated as such because there is no follow-up to the screening for mental illness which is done when an inmate first enters the Iowa Department of Corrections (IDOC). Additionally, the Court found that lockup inmates are segregated and supervised with indifference to their need for mental health treatment and that inmates with serious, but treatable, mental disorders receive almost no treatment at ISP. *Id.* at 89–91.

### 1. Defendants' Plan

Defendants have been working toward the development of a 200–bed special needs unit at ISP for several years now. They began this journey with the commissioning of a special needs report. *See* Exhibits 95 and 110. Defendants have now sought and unit. The most recent update from Director Kautzky, provided at a hearing held June 15, 1999, indicated that architectural designs are being drawn, with construction scheduled to begin in the late 1999 and operation expected in late 2000. (Tr. 11–12.)

As a bridging measure prior to the opening of the 200–bed special needs unit at ISP, defendants propose a reintegration program to be established at Newton Correctional Facility. Through the reintegration program, ISP lockup inmates who show willingness to change would be provided an opportunity to return to general population. Defendants expect, and have so testified, that the Newton reintegration program will be operational for 150 inmates, many of whom will be pulled from lockup at ISP, by August 1999.

Also as a bridging measure, Director Kautzky testified at the hearing held June 15, 1999, that "[o]ffenders who are in need of medical and/or mental health care right now are transferred back to the Iowa Medical and Classification Center and are accommodated routinely at that facility, and once stabilized they are returned to the Iowa State Penitentiary if, in fact, their security definition requires that assignment." (Tr. 12.)

A further measure planned by defendants to remedy the problem of providing treatment for the mentally ill and mentally disordered lockup inmates is to, as soon as possible, add a doctorate level psychologist to the staff at ISP. Defendants acknowledge, however, that recruitment of qualified psychologists remains difficult.

### 2. Plaintiffs' Objections

Plaintiffs acknowledge defendants' plan to build a 200–bed special needs unit at ISP and admit that "to the extent that the Defendants have a plan for this new unit, adequately staffed, which will have indoor exercise facilities, it is hard to argue that Defendants have not addressed for the *long* term, the court's concerns for mental health care at Fort Madison." Plf.'s Objections and Comments at 8.

Plaintiffs argue, however, that there remains a problem as to delivery of mental health care in the *short* term. Plaintiffs argue that in 1996, during the trial of this case, there were three full-time psychologists and that these three full-time psychologists were not enough. Now they point out that the number of psychologists has dropped to one and simply going back to three psychologists does not remedy the problem found by the Court. Plaintiffs argue that the psychological staff at ISP should be expanded beyond the size it was in 1996.

case on June 5, 1997, there are two distinct violations involving the mentally ill. One violation relates to the fact that the institution has been deliberately indifferent to the need of these inmates for medical treatment. This violation is discussed in Part II(B) of this order. The other violation is actually a viola-

tion of the rights of the mentally stable inmates because the mentally stable inmates are subjected to the pandemonium and bedlam created by the mentally ill inmates who either cannot or do not control their behavior. That violation is discussed below in Part II(D) of this order.

Plaintiffs further argue that the new disciplinary and classification policies have made things much worse now for mentally ill inmates than they were before. They argue that the longer disciplinary sanctions coupled with the elimination of the policy of "breaks," or a chance to "come up for air" from periods of disciplinary detention, is a disastrous mix.

### 3. Appropriate Relief

The Court is persuaded that defendants are moving in the right direction in relation to the treatment of the mentally ill. In the two years that this case has been in the remedial stage, defendants have commissioned a report on special needs (*see* Exhibit 110) and received funding from the Iowa legislature for a 200–bed special needs unit at ISP. Getting this new special needs unit up and running should serve to remedy, in the long run, the Eighth Amendment violation arising from defendants' deliberate indifference to the mentally ill and mentally disordered inmates' need for medical and psychiatric care. The Court will rely on the sworn testimony provided by Director Kautzky and others that all due diligence will be given to making the 200–bed special needs unit a reality in the near future. Therefore, as far as this Court is concerned, the 200–bed special needs unit is practically a fait accompli and will not be further addressed.

It is true, however, as plaintiffs point out, that the special needs unit at ISP will not be functional for another year or more.[16] In the meantime, it is important that lockup inmates have access to meaningful medical treatment. At the June 15, 1999, hearing before this Court, Director Kautzky testified that the Iowa Medical and Classification Center (IMCC) was being used to treat and stabilize inmates with mental and medical conditions until the new 200–bed special needs unit at ISP is functional. The Court must note that this procedure has been rarely used in the past and any increase in its use would be a positive temporary step.[17] This action is commendable and the Court encourages defendants to continue with this course of action.

As mentioned, at the June 15, 1999, hearing before this Court, Director Kautzky also testified that while there have been three psychologist positions authorized for ISP for some time, in reality, only two of those three positions have been filled at any one time and the number of psychologists on staff had dropped to only one in 1999. (Tr. 67–68, 18.) Director Kautzky testified that recruitment of individuals to fill these positions was difficult but that he understood offers were being made to a masters' level psychologist and a doctorate level psychologist, so that if these offers were accepted, the three psychological staff positions authorized would be filled.

Therefore, until the new special needs unit at ISP is functional, the Court directs that defendants shall maintain funding for three psychologists, including one doctorate level psychologist. The Court further directs that defendants shall have until **December 1, 1999,** to fill each one of those three positions which currently remains open with qualified individuals or, in the alternative, to contract with a third-party provider to supply such services. If any individual who has been hired to fill an in-house psychologist position resigns, defendants shall have six months from his or her resignation within which to either fill that position or contract with a third-party provider of psychological services. If defendants choose to contract with a third-party provider of psychological services, under such contract the services rendered

---

**16.** At the hearing held on June 15, 1999, Director Kautzky testified that construction on the 200–bed special needs unit was scheduled to begin in late 1999 with operation expected in late 2000. (Tr. 11–12.)

**17.** The Court has independent knowledge that at least one disruptive inmate was recently transferred to the IMCC unit for treatment. During the interim period until the 200–bed special needs unit is operational, this should happen much more often.

shall be equivalent in nature and amount to those which would have been provided had qualified individuals been hired to fill the positions remaining open.

As previously set out, plaintiffs have argued that three psychologists are not enough. The Court is persuaded that the evidence reveals that even though three positions have been authorized in the past, they have not all three been filled on a consistent basis. Not only authorizing, but keeping filled three psychologist positions will allow for a large increase in the mental health resources available to lockup inmates over those which have been available in the past. Accordingly, the Court declines to adopt plaintiffs' suggestion that an increase in the number of psychological staff be precisely ordered at this time.

The Court is persuaded and plaintiffs concede that the new 200–bed special needs unit at ISP, when adequately staffed, should remedy the violation relating to medical treatment for the mentally ill and mentally disordered lockup inmates. The violation found by the Court is already two years old, will not go away on its own, and as recognized by all involved, the special needs unit solution is at least another year away. Therefore, in accordance with 18 U.S.C. § 3626(a), the Court finds that the relief ordered to remedy the constitutional violation relating to medical treatment for the mentally ill and mentally disordered is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

## C. Exercise

In its order of June 5, 1997, the Court determined that the Eighth Amendment's prohibition on cruel and unusual punishment was violated because inmates in lockup at ISP are denied a meaningful opportunity to exercise during the long, cold, winter months. The evidence at trial revealed that only one out of five inmates who opted to exercise in August 1995 also opted to exercise in February 1994. *See* Order at 100–105 (June 5, 1997).

### 1. Defendants' Plan

In response to the Court's order for a plan to remedy the violation relating to exercise, defendants indicate that the 200–bed special needs unit approved for ISP will include indoor exercise facilities and covered outdoor facilities.

To correct this violation relating to exercise in the interim, while the special needs unit is being constructed, defendants indicate that they have renovated two cells in Cellhouse 219, two cells in Cellhouse 220, and eight cells in Cellhouse 319. By "renovated," defendants mean that plumbing has been removed from those cells and chin-up bars have been installed. Defendants further indicate that the purchase of additional exercise equipment, subject to security concerns, is being studied.

### 2. Plaintiffs' Objections

Plaintiffs argue that defendants have known about the violation relating to exercise now for two years and that they should be required to specifically state now what additional equipment will be added to these renovated cells. Plaintiffs further argue that defendants should be required to cover outside exercise pens with roofs so as to keep precipitation off the inmates in bad weather.

### 3. Appropriate Relief

The Court is persuaded that defendants' plan to provide an opportunity for indoor exercise during the long, cold, winter months and during other inclement weather is commendable if properly implemented. The Court understands that the population of inmates in lockup is not static, that only a certain number of inmates may exercise at any given time since they exercise in isolation, and that inmates must be moved to and from indoor exercise cells by ISP staff. Therefore, it is important for defendants to be able to maintain the flexibility to add to or subtract from the number of cells dedicated to indoor exercise as

long as they maintain sufficient cells dedicated to indoor exercise so that all lockup inmates who choose to exercise indoors are permitted to do so.

The Court is further persuaded that an important component to the ability to exercise is the ability to engage in some kind of cardiovascular activity.[18] At the June 15, 1999, hearing in this case, Director Kautzky indicated that it was possible to modify certain exercise equipment so that it could be used by inmates in lockup status without jeopardizing the safety of the institution. (Tr. at 63.)

Finally, the Court notes that dialogue between the Court and Director Kautzky at a hearing held in this case on October 15, 1998, reveals that relief of the nature ordered is in accordance with the practices of penal institutions located in other states bordering Iowa. (Tr. 55–58.) For example, the Minnesota maximum security facility has both outdoor and indoor exercise areas available and uses the transition to Daylight Savings Time as a time for making the change from outdoor to indoor exercise and vice versa. Two other adjoining states, South Dakota and Nebraska, also provide indoor exercise from October through April. This information persuades the Court that the concept of providing indoor exercise areas in regions with harsh winter weather is an accepted reality for penal institutions and not a drastic or intrusive remedy in this case.

The Court has considered plaintiffs' argument that the outdoor exercise areas should be covered with a roof. The crux of the exercise problem which resulted in the Court's finding of a violation of the Eighth Amendment was that the nature of Iowa's long, harsh winters meant that in-

mates could be deprived of a meaningful opportunity to exercise for periods of several months. An inmate's decision to decline exercise on occasion because it is raining or snowing cannot be compared to the deprivation of outdoor exercise which results from long stretches of below-freezing weather. Accordingly, the Court declines to adopt plaintiffs' suggestion that existing outdoor exercise facilities be covered since roofs would not affect the temperature and the number of successive rainy days is not large.[19]

Accordingly, the Court directs that, as they have promised, defendants shall construct indoor exercise facilities in all lockup cellhouses and covered outdoor exercise areas in the 200–bed special needs unit at ISP. The Court further directs that defendants shall maintain as indoor exercise cells that number of cells necessary to accommodate the number of inmates housed in the lockup units who elect to participate in indoor exercise during inclement weather. The Court further directs that by **December 1, 1999,** defendants shall equip the areas designated for indoor exercise with such exercise equipment of their choice as will provide an opportunity for inmates exercising in them to engage in aerobic exercise. The Court's directive is intended to give defendants maximum flexibility but is given with the caution that deprivation of exercise is not a minor matter. The Court expects that as defendants comply with this directive, they will keep in mind the solid reasons set out on pages 103–105 of the Court's findings of facts and conclusions of law, dated June 5, 1997, for providing lockup inmates with a meaningful opportunity for exercise during

---

18. "Where movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised." *French v. Owens,* 777 F.2d 1250, 1255 (7th Cir.1985) *cited with approval in Wishon v. Gammon,* 978 F.2d 446, 449 (8th Cir.1992).

19. Although the Court has declined to adopt plaintiffs' suggestion to put roofs on some exercise areas, it is a good suggestion and one which defendants may want to consider so as to enhance the inmates' chance to exercise outdoors, which the Court believes may in turn, lessen the tensions which inevitably build up when the inmates remain confined indoors without adequate exercise.

the long winter months.[20]

In accordance with 18 U.S.C. § 3626(a), the Court finds that the relief ordered to remedy the constitutional violation relating to exercise is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

### D. Pandemonium and Bedlam

■ The final violation found by the Court was a violation of the Eighth Amendment resulting from the pandemonium and bedlam the mentally stable inmates must suffer because they are intermingled with the mentally ill inmates who either cannot or do not control their behavior. One particular portion of cellhouse 220 was so bad that it was commonly known as "the bug range." This Court cannot sum up the situation any better than one inmate who testified in this case, "Cellhouse 220 is noisy—lots of banging and really dirty. Being on the bug range is very stressful, it takes its toll. You can't sleep, you get high blood pressure and turn into a mad man." [21] *See* Order at 34 (June 5, 1997).

### 1. Defendants' Plan

Defendants argue that changes in the administrative segregation policy, disciplinary policy, and classification review process permit an offender who has the desire to advance to general population status to do so. They plan to use a new reintegration program at Newton Correctional Facility to permit locked offenders an opportunity to return to general population status. Defendants also indicate that they are attempting to use the special needs unit at Oakdale IMCC to address the needs of inmates who should be treated there. Defendants also plan to add to the clinical staff at ISP, namely a doctorate level psychologist, although they again cite the difficulties they face in recruiting qualified personnel. Defendants argue that the classification system put into place on July 1, 1998, has already taken care of, for the most part, the situation where mentally stable inmates are subjected to pandemonium and bedlam.[22] As support for that contention, they point to the Court's comment at a hearing held on October 15, 1998, that "[o]f the 45 [offenders] that are now in [cellhouse] 220, only nine of those were there when I said there was bedlam." (Tr. at 184.)

### 2. Plaintiffs' Objections

Plaintiffs did not direct any objections or comments particularly to that portion of defendants' plan addressing the violation relating to the pandemonium and bedlam in ISP's lockup units.

### 3. Appropriate Relief

The 200–bed special needs unit will go a long way toward remedying the violation arising from the exposure of mentally stable inmates confined in lockup to the pandemonium and bedlam created by mentally ill and mentally disordered inmates. Presumably, inmates who are not mentally ill or mentally disordered will have little need to be placed in the new special needs unit and they will no longer be subjected to the antics of the mentally ill and disordered.

---

20. For example, plaintiff's expert, Gordon Kamka, testified at trial that inmates afforded as few exercise opportunities as the lockup inmates at ISP will become lazy and lethargic, gain weight, and develop medical problems. It must be recognized that lazy, lethargic, overweight inmates with health problems will cost our society more in the long run in dollars and other societal costs than will the few pieces of exercise equipment which might help to prevent them from exiting institutions such as ISP in such shape.

21. For further description of the bedlam in the lockup units and the Court's discussion of the Eighth Amendment violation arising from the pandemonium and bedlam in the lockup units, *see* the Court's order of June 5, 1997, at 33–42 and 105–111.

22. Bottom line to defendants' contention is apparently that the procedures they have instituted has decreased the concentration of "bugs" or disruptive mentally ill inmates in the lockup cellhouses.

Further, with the delivery of proper medical treatment to those housed in the special needs unit, one would expect that the antics of the mentally ill or disordered inmates should decrease.

There remains the question of what should be done until the special needs unit is operational. The Court is persuaded that the opportunity for pandemonium and bedlam appears to have decreased to some extent.[23] The Court bases this conclusion on the fact that at trial, there was substantial testimony concerning the "Bug Range" and the inmates who lived there, banging and screaming and carrying on at all hours of the day and night. In the Court's findings of fact and conclusions of law, the Court discussed some of the testimony received and in doing so, identified approximately 30 inmates by number rather than by name so as to prevent those individuals from carrying with them a "taint." A key that matched the numbered inmates with their true identities was filed under seal in this case. The Court has compared that key with the most recent lockup list provided by defendants in this case. *See* Exhibit 145. A comparison of those lists reveals that of the 30 inmates who were discussed as banging, screaming, or in other ways being disruptive or exhibiting major signs of mental illness, only about ten remain at ISP in locked status. Interestingly, four of those inmates are housed in close proximity to each other in Cellhouse 220. The rest are scattered through the populations of Cellhouses 220 and 319.

The Court is persuaded that the 200-bed special needs unit should remedy the violation relating to pandemonium and bedlam in the long run and that the problem has diminished significantly in the years since the trial of this case to the point that it is not feasible for this Court to attempt to fashion a short-term solution. Accordingly, since defendants have already committed to the construction of a 200-bed special needs unit and are well along the

path toward operation of that facility, the Court will grant no relief to plaintiffs in respect of the violation relating to pandemonium and bedlam.

## IV. Conclusion

The Court is encouraged by the positive changes at ISP—both those which have taken place over the past several years and those to which defendants have committed in the next several years. Those positive changes have been discussed at length above, but the Court is persuaded that they should be noted here once again: defendants recognized the need for and have received funding from the legislature for the construction of a 200-bed special needs unit at ISP, with operation of that unit expected late in the year 2000; defendants recognized that inmates facing years and years of lockup time could not work their way out and granted all inmates amnesty from their lockup times as of July 1, 1998; defendants have converted more cells to general population status at ISP to permit movement out of the locked statuses (and they should continue to do so in order that inmates who no longer belong in locked statuses are not kept there simply for lack of general population cells); defendants have developed a plan whereby locked offenders at ISP may be reintegrated to general population statuses through a reintegration program established at Newton Correctional Facility; defendants have implemented an uniform sentencing matrix, or sentencing ranges, to be used by the ALJs in setting the period of disciplinary detention to be served for various rules violations; defendants have made clear to the ALJ at ISP that he has the authority to dismiss, reduce, and lump together reports in determining the sanctions for rules violations; and defendants have established a procedure whereby ALJs are able to take into consideration the mental diagnosis of an inmate before sanctioning him for rules violations.

---

**23.** The Court does note, however, that even on recent occasions, it has received complaint letters from individual inmates about the excessive noise levels in Cellhouse 220.

To the plaintiffs, this Court would say, "Rome wasn't built in a day." Progress and change take time. While defendants have made several changes for the positive, there have also been some changes which this Court would call negative: defendants have changed the disciplinary policy so that inmates can be sentenced to significantly longer periods in disciplinary detention for a single incident than were available under previous policies; defendants have changed the disciplinary policy to eliminate the periodic "breaks" from disciplinary detention which historically have been available to inmates serving disciplinary detention for periods of more than 30 days; and defendants have made the use of log book entries a factor in determining when an inmate will be released from the indefinite periods of administrative segregation which they serve under the new policy.

As is evident, defendants have put some effort into crafting a plan that should, in the long run, remedy most of the problems found by the Court in this case. The Court has attempted to carefully and within the limits set out in the PLRA at 18 U.S.C. § 3626 craft relief for the interim in those areas where defendants' plan is lacking. In accordance with 18 U.S.C. § 3626(a), the Court finds that the relief ordered herein relating to the four constitutional violations set out in the Court's findings of fact and conclusions of law is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

In this Court's findings of fact and conclusions of law, the Court stated that it would permit defendants an opportunity to comply with its directive to develop a plan to remedy the problems found by the Court before the Court would further consider plaintiffs' request for injunctive relief. The Court is now persuaded that between defendants' plan four and the additional relief set out herein by the Court, the problems found in this case may be remedied without a grant of the injunctive relief requested by plaintiffs. Accordingly, plaintiffs' request for injunctive relief will be denied at this time with the opportunity for plaintiffs to re-urge such relief later if deemed appropriate.

For the reasons set out above,

**IT IS HEREBY ORDERED** that defendants' plan four (docket # 294), except to the extent that it provides for continuous periods of disciplinary detention in excess of 30 days and except to the extent other limitations are included in this order, and in light of the additional relief ordered by the Court herein, is adopted by the Court.

**IT IS FURTHER ORDERED** that defendants plan will be modified to allow a two-day (48–hour) "breath of air" after every thirty days of disciplinary detention served, even if that "breath of air" only allows a couple of personal telephone calls and a chance to, just for that period, have access to some additional personal property the inmate may own such as some cigarettes, a radio, a television, and a newspaper.

**IT IS FURTHER ORDERED** that defendants, by their representative, Director Kautzky or his designee who is not a person employed at ISP, shall meet, with three representatives from the plaintiffs' class, to be chosen by the plaintiffs, for an adequate time not to exceed three hours once a month for each of the next six months so that Director Kautzky shall receive input from the inmates as to the problems the inmates are experiencing with the implementation of the new policies in relation to long lockup sentences and related matters. These meetings should be held face to face but could be held via the ICN if a personal meeting proves to be difficult.

**IT IS FURTHER ORDERED** that defendants, until the new special needs unit at ISP is functional, shall maintain funding for three psychologists, including one doc-

torate level psychologist. All three of these positions shall be filled by December 1, 1999. If defendants are not able to do that, they shall by that time contract with a third-party provider to supply such services.

**IT IS FURTHER ORDERED** that defendants shall maintain as indoor exercise cells the number of cells necessary to accommodate the number of inmates housed in the lockup units who would like to participate in indoor exercise during inclement weather. By December 1, 1999, the defendants shall equip the areas designated for indoor exercise in the lockup units with such exercise equipment of their choice as will provide an opportunity for the inmates exercising in them to engage in cardiovascular and/or aerobic exercise.

**IT IS FURTHER ORDERED** that plaintiffs request that the number of psychologists be increased is denied.

**IT IS FURTHER ORDERED** that plaintiffs request that the outdoor exercise areas at ISP be covered with roofs is denied.[24]

---

24. The defendants now maintain that some if not all of the significant steps taken to improve the conditions at the Iowa State Penitentiary set out in this Order were being considered and would have been implemented by the State and that this lawsuit was not a moving force in these improvements. Few of the plaintiffs here would so agree. This Court is not interested as to what the motivating forces were. The clear improvements and more to come provide enough satisfaction for all. The readers can decide this question for themselves if so inclined.